UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

TYGARI D.,
            *Plaintiff*,

    v.

KILOLO KIJAKAZI, Commissioner of
Social Security,[1]
            *Defendant*.

Case No. 1:20-cv-00697-LO-MSN

## REPORT AND RECOMMENDATION

This matter comes before the Court on the parties' cross-motions for summary judgment (Dkt. Nos. 21, 23). Plaintiff Tygari D. ("plaintiff") seeks judicial review of the final decision of defendant Kilolo Kijakazi, Commissioner of the Social Security Administration, finding that her previously-recognized disability ended on July 18, 2018 under section 223(f) of the Social Security Act, 42 U.S.C. § 423 (the "Act"). For the reasons stated below, the undersigned Magistrate Judge recommends that plaintiff's Motion for Summary Judgment (Dkt. No. 21) be DENIED, defendant's Motion for Summary Judgment (Dkt. No. 23) be GRANTED, and the ALJ's decision be AFFIRMED.[2]

## I.    Background

The Social Security Administration ("SSA") originally found that plaintiff was disabled due to affective and personality disorders beginning on November 29, 1996. AR at 15, 99. The

---

[1] Kilolo Kijakazi is the Acting Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d). See also section 205(g) of the Social Security Act, 42 U.S.C § 405(g) (action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

[2] The Administrative Record ("AR") in this case has been filed under seal, pursuant to Local Civil Rules 5 and 7(C). (Dkt. No. 17). In accordance with those rules, this report and recommendation excludes any personal identifiers such as plaintiff's full name, social security number and date of birth (except for the year of birth), and the discussion of plaintiff's medical information is limited to the extent necessary to analyze the case.

SSA later found that plaintiff remained disabled by panic, adjustment, and attention deficit/hyperactivity ("ADHD") disorders on July 14, 2014, but that her disability ceased as of July 18, 2018. *Id.* at 15, 17.

On April 4, 2019, plaintiff appeared before Administrative Law Judge ("ALJ") Raghav Kotval for a hearing to challenge the SSA's cessation determination. *Id.* at 16. Plaintiff, represented by an attorney, testified at that hearing, as did a Vocational Expert ("VE"). *Id.* at 15–16. On May 6, 2019, the ALJ issued a decision finding that plaintiff suffered from migraines and ADHD, as well as anxiety, affective, and learning disorders, but was not disabled under the Act. *Id.* at 18, 28. The Appeals Council found no basis to review and affirmed the ALJ's decision. *Id.* at 1.

Having exhausted her administrative remedies, plaintiff filed a Complaint with this Court on June 19, 2020, challenging the ALJ's decision. (Dkt. No. 1). Plaintiff filed a Motion for Summary Judgment (Dkt. No. 21) on April 23, 2021, including a Memorandum in Support of Plaintiff's Motion for Summary Judgment (Dkt. No. 22). The Commissioner filed a Cross-Motion for Summary Judgment (Dkt. No. 23) on May 24, 2021, along with a Memorandum in Support of Defendant's Cross-Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment (Dkt. No. 24). Accordingly, the parties' motions are ripe for disposition.

## II.     Evidence before the ALJ

Below is a summary of plaintiff's testimony before the ALJ and other medical evidence of plaintiff's impairments.

### A.     Testimony at the Administrative Hearing

At the hearing on April 4, 2019, plaintiff, represented by an attorney, appeared before the ALJ. AR at 37. She was forty years old and living in a shelter at the time. *Id.* at 67. She had attended

five years of college but had not earned a degree. *Id.* at 43.

On November 11, 2016, plaintiff received an orchiectomy (gender confirming surgery). *Id.* at 55. Before undergoing that procedure, plaintiff was "angry at everything." *Id.* at 58. But after it, her condition improved and the "cloud" around her head "faded." *Id.* at 58–59.

Even so, plaintiff testified that she continued to experience periods of heightened emotions, racing thoughts, and insomnia at a rate of one week per month. *Id.* at 64–65. Plaintiff explained she also experienced subsequent "crash[es]", during which she found it difficult "to even find the motivation to get up to go eat, drink, [or use the] bathroom." *Id.* at 65–66. Plaintiff estimated that such "depressive" periods occurred between four-to-five days per month. *Id.* at 66.

Plaintiff described corresponding difficulties concentrating and maintaining her focus. *Id.* at 52–53. At the same time, however, she testified that she was able to dedicate four days per week to developing a computer game, additional time to studying computer science, and she recently had completed a month-long programming "boot camp" that ran Mondays through Fridays from 9:00 a.m. to 5:00 p.m. and was hosted by Nova Labs. *Id.* at 50–54, 59–60.

In testimony from the VE, it was established that plaintiff had no prior work experience. *Id.* at 75. The ALJ posed the following hypothetical for the VE to consider: The hypothetical person had plaintiff's same vocational profile in terms of age, education, and work experience and was limited to simple routine tasks, "not at a production pace," performed in two-hour increments, following which the individual would need a break of ten-to-fifteen minutes. *Id.* In addition, the hypothetical person could only occasionally interact with supervisors, co-workers, and the public; could only occasionally adjust to changes in the workplace setting; could only work in an environment that was moderately loud or quieter; and could only work in an environment with stable lighting no brighter than that of an office. *Id.* at 76–77.

3

The VE testified that the following positions exist in the national economy that satisfy the limitations set forth by the ALJ: laundry laborer (45,000 jobs), store laborer (55,000 jobs), and evening industrial cleaner (40,000 jobs). *Id.* at 77.  The VE further testified that each of those jobs permitted an individual to be absent once per month. *Id.* at 78.  The VE continued, however, that no such jobs existed for individuals who would be absent from work more than one day per month. *Id.* Nor were there any jobs that allowed the individual to be absent for two days in one month, one day the next, and two days during the third month. *Id.*

### B.    Record Evidence

On May 14, 2014, plaintiff completed a Continuing Disability Review Report.[3]  *Id.* at 283. In it, she described the following daily activities: playing games, watching movies, cooking, doing chores, walking for exercise, and addressing house responsibilities (such as paying bills). *Id.* at 287. She listed her hobbies as playing and designing games, as well as cooking. *Id.* And she identified no difficulty, *inter alia*, dressing, bathing, preparing meals, shopping, walking, standing, lifting objects, completing tasks, or following directions. *Id.* at 287–88.  Plaintiff did, however, note difficulties concentrating and getting along with people. *Id.* at 288.

On June 5, 2014, plaintiff completed a Function Report in which she listed her daily routine as including: waking up, showering, playing games, planning lunch or dinner, doing some chores, grocery shopping, cooking, watching Netflix, and sometimes reading. *Id.* at 290.  Regarding her cooking, plaintiff stated she prepared sandwiches, frozen dinners, and/or complete meals daily. *Id.* at 292. As for house and yard work, plaintiff reported cleaning, as well as washing dishes and doing laundry. *Id.* at 292. Plaintiff also noted that she completed those tasks without help or encouragement. *Id.* Plaintiff did state, however, that she had difficulty getting along with others.

---

[3] The form appears to be un-dated, but this is the date provided in the official table of contents to the administrative record.

4

*Id.* at 295. She also described struggling to maintain concentration. *Id.* at 295. Despite that limitation, plaintiff reported an ability to "keep coming back" to a task until it was "finished." *Id.*

On June 25, 2014, plaintiff underwent a consultative examination with Dr. Martha Merrion, PhD, PA. *Id.* at 372. During the Mental Status Examination administered by Dr. Merrion, plaintiff showed an "overall mental status" that was "only mildly impaired." *Id.* at 378. Dr. Merrion also opined that plaintiff had an "overall mild to moderate impairment level for functioning in full-time employment within a competitive work environment." *Id.* at 380.

On July 11, 2014, plaintiff was evaluated by Dr. Sandra Francis, PsyD, who performed a mental residual functional capacity assessment. *Id.* at 381. Through it, Dr. Francis opined that plaintiff was moderately limited in her ability to: maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, and respond appropriately to changes in the work setting. *Id.* at 381–82. Dr. Francis noted no other limitations. *Id.*

Similarly, Dr. Francis opined that plaintiff had mild restrictions regarding her activities of daily living, moderate difficulties maintaining social functioning, concentration, persistence, or pace, and no episodes of decompensation. *Id.* at 395.

On July 14, 2014, the SSA continued plaintiff's disability finding due to affective, mood, and personality disorders that satisfied Listing 12.04 (depressive, dipolar and related disorders). *Id.* at 97. The SSA noted that the evidence it had on file showed that plaintiff was "doing well" but

that SSA policy required continuation of plaintiff's disability benefits in light of her prior file having been destroyed.[4] *Id.* at 99.

On April 29, 2016, plaintiff was seen by Dana Stalling, LCSW-C, at Chase Brexton Health Care for an initial mental health assessment. *Id.* at 632.  Plaintiff's desire for gender confirming surgery motivated her to seek that evaluation, which noted plaintiff describing symptoms of anxiety, depression, and mania. *Id.* at 632–33. Plaintiff specifically reported "feeling down, depressed, or hopeless" on "[m]ore than half the days" in a two-week period, and thinking "that [she] would be better off dead or that [she] want[ed] to hurt [her]self in some way . . . [n]early every day" during that same period. *Id.* at 634. Plaintiff also described having "[t]rouble concentrating on things such as reading the newspaper or watching television" for "[s]everal days." *Id.* And plaintiff noted it had been "[s]omewhat [d]ifficult" for her to "do [her] work, take care of things at home, or get along with other people." *Id.* at 635.  Plaintiff was diagnosed with "Moderately Severe Major Depression." *Id.* Her Patient Health Questionnaire ("PHQ-9") reflected a score of 16.  *Id.*

Plaintiff returned to Chase Brexton Health Care for individual therapy sessions with Dr. David Goode Cross, PhD, on May 16 and 24, 2016. *Id.* at 642–46.  His prognosis was that plaintiff's "level of functioning [wa]s reasonably expected to be maintained, if not improved," through her therapy treatment. *Id*. Dr. Cross's notes, however, reflect that plaintiff "indicated that if she did not receive gender confirmation surgery by a specific date she intended to end her life." *Id.* at 647.

Chase Brexton Health Care transferred plaintiff's treatment to Dr. Jessica Rothstein, PsyD, who saw plaintiff for individual therapy sessions on June 13 and 20, 2016.  *Id.* at 648–53. Dr.

---

[4] The SSA destroyed plaintiff's medical records prior to 2014.  AR at 96.

Rothstein adopted Dr. Cross's prior prognosis during those sessions.  *Id.* at 649, 651.

Plaintiff returned to Dr. Rothstein on July 4, 2016. *Id.* at 654. She reported "feeling down, depressed, or hopeless" for "[n]early every day" during the prior two weeks and stated she also had "[t]rouble concentrating on things such as reading the newspaper or watching television" during "[n]early every day." *Id.* Plaintiff further stated that her reported "problems made it . . . [v]ery [d]ifficult . . . to do [her] work, take care of things at home, or get along with other people." *Id.* at 655. Plaintiff received a score of 19 on her PHQ-9, which showed "Major Depression" causing "Very Difficult . . . Functional Impairment." *Id.*

On July 11, 2016, plaintiff again attended an individual therapy session with Dr. Rothstein—an appointment for which plaintiff arrived five hours early. *Id.* at 657. During that session, plaintiff reported spending three days "volunteer[ing] at a role play type convention working anywhere from 8–12 hour shifts." *Id.* In response, Dr. Rothstein issued the same positive prognosis as before. *Id.* at 658.  Dr. Rothstein re-adopted that prognosis following therapy sessions with plaintiff on July 26, and August 8, 15, and 22, 2016. *Id.* at 661, 664, 628, 631.

On September 7, 2016, plaintiff missed a commuter train and was late to her individual therapy session with Dr. Rothstein.  *Id.* at 609.  Plaintiff, however, called Dr. Rothstein's office in advance to let the office know she would be late. *Id.*  Plaintiff stated that she did so because she was "worried missing [the session] 'would be used against her.'" *Id.* Dr. Rothstein's observations and conclusions showed no material changes. *Id.*

Plaintiff returned to Dr. Rothstein for individual therapy sessions on September 21 and October 12, 2016; Dr. Rothstein's observations and prognoses remained largely unchanged from prior sessions. *Id.* at 612, 624.

On October 26, 2016, plaintiff again participated in an individual therapy session with Dr.

Rothstein, during which plaintiff described being "hopeful" regarding her planned orchiectomy. *Id.* at 583.

On December 7, 2016, plaintiff returned to Dr. Rothstein for individual therapy treatment following her orchiectomy. *Id.* at 586. Dr. Rothstein used that session to transition plaintiff's care to Dr. Matthew Malouf, PhD. *Id.* When doing so, Dr. Rothstein noted that plaintiff's gender dysphoria had "improved" and that her "level of functioning [wa]s reasonably expected to be maintained, if not improved" through plaintiff's continued therapy treatment. *Id.* at 587–88.

On March 22, as well as April 3 and 19, 2017, plaintiff was "engaged and cooperative" in her therapy sessions with Dr. Malouf. *Id.* at 695–700.

On May 17, 2017, Dr. Malouf conducted a "Depression Screening" of plaintiff, during which plaintiff reported "[s]everal days" of having little interest or pleasure in doing things and that she felt "down, depressed, or hopeless" for "more than half the days." *Id.* at 591. Plaintiff also reported "[t]hinking that [she] would be better off dead or that [she] want[ed] to hurt [her]self in some way" on "several days." *Id.* at 592. When asked if she had "[t]rouble concentrating on things such as reading the newspaper or watching television", however, plaintiff responded "[n]ot at all." *Id.* Overall, plaintiff reported that her symptoms made it "[s]omewhat [d]ifficult" for her to "do [her] work, take care of things at home, or get along with other people." *Id.* at 593. Plaintiff received a score of 8 on her PHQ-9, which showed a "Somewhat Difficult . . . Functional Impairment." *Id.*

Plaintiff returned to Dr. Malouf for individual therapy treatment on May 31, 2017. *Id.* at 596. There, she was "engaged and cooperative" and Dr. Malouf reported a prognosis that was unchanged since he took over from Dr. Rothstein. *Id.*

On June 14 and 21, 2017, plaintiff returned to Dr. Malouf, whose notes from those sessions

show no material changes in observations or prognosis.  *Id.* at 599–604.

On July 5 and 19, 2017, plaintiff again participated in individual therapy sessions with Dr. Malouf. *Id.* at 562, 605. Those sessions focused on plaintiff's plan for breast augmentation surgery. *Id.* Dr. Malouf's notes show that he noticed no abnormal behavior and "reasonably" expected plaintiff to "maintain" her "level of functioning." *Id.* at 562–64, 605.

On August 2, 2017, plaintiff returned to Dr. Malouf.  *Id.* at 565.  His prognosis was unchanged.  *Id.* Plaintiff returned again on August 16, 2017 and requested to be seen by a new clinician. *Id.* at 568.  Even so, Dr. Malouf noted plaintiff was "engaged and cooperative in session." *Id.*

On August 31, 2017, plaintiff participated in an individual therapy session with Dr. Rachel Freed, PsyD. *Id.* at 571. Dr. Freed also commented that she "reasonably" expected plaintiff to "maintain[], if not improve[]" her "level of functioning" in response to therapy. *Id.* at 572. Dr. Freed reported no abnormal behavior. *Id.* at 572–73.

On September 6, 2017, plaintiff again completed a Continuing Disability Review Report.[5] *Id.* at 300. In it, she described her daily activities as mostly studying computer programming at Nova Labs. *Id.* at 305. Plaintiff no longer listed hobbies, however, as she stated she was "to[o] busy studying to participate in [her] hobbies." *Id.* Plaintiff also reported difficulty in concentrating ("I am very hyperactive"), remembering ("my mind is always firing off"), and getting along with others. *Id.* at 306. Plaintiff elaborated that she "worked for Wendy's for a couple months but conflicts caused [her] to quit." *Id.* at 306. Since then, she focused almost exclusively on studying computer programming and even "released [the] first video game [she] programmed on Kongregate." *Id.*

---

[5] The form appears to be un-dated, but this is the date provided in the official table of contents to the administrative record.

Plaintiff returned to Dr. Freed on October 5, 2017. *Id.* at 574. Dr. Freed offered the same prognosis as before, while commenting that plaintiff reported "her mood [h]as been stable" even though "she is always depressed." *Id.* at 574–75.

On November 2, 2017, plaintiff again attended a therapy session with Dr. Freed to whom she reported that "her mood has been stable overall." *Id.* at 577.  Dr. Freed again offered the same prognosis as before and noted no abnormal findings. *Id.* at 577–79.

On December 7, 2017, plaintiff visited Dr. Freed again and reported "her mood as stable." *Id.* at 580. In response, Dr. Freed offered the same prognosis and findings as before. *Id.* at 580–82.  On January 4 and 18, 2018, plaintiff again attended individual therapy sessions with Dr. Freed, who noted no material changes in plaintiff's presentation. *Id.* at 666–69.

On January 31, 2018, the SSA issued a Disability Determination Explanation that terminated plaintiff's continuing benefits while noting "the totality of the evidence appears to suggest that significant medical improvement has been achieved and that the clmt [*sic*] is now able to return to significantly gainful employment."  *Id.* at 103.  State Agency consultants Jack Hutcheson and Leslie E. Montgomery, PhD, ABPP, however, were restricted in their ability to evaluate plaintiff due to plaintiff's failure to return required questionnaire forms. *Id.* at 105.  The result was that both doctors had "insufficient evidence available from which to make a proper medical determination on [plaintiff's] claim for disability" and plaintiff's claim was terminated as a result.  *Id.* at 105–06.  Nonetheless, Dr. Montgomery did note that plaintiff was "doing well . . . with no anxiety or depression."  *Id.* at 106.

Plaintiff returned to Dr. Freed on February 1, 2018. *Id.* at 670.  She received a PHQ-9 score of 13, which found plaintiff's "Functional Impairment" to be "Somewhat Difficult." *Id.* at 674.

On February 9, 2018, plaintiff again attended an individual therapy session with Dr. Freed.

*Id.* at 675.  There, plaintiff "endorsed current symptoms of depression associated with gender dysphoria" but "shared updates with her IT development, positive feelings associated with extra money received from SSI and how she plans to utilize the money towards [breast augmentation] surgery." *Id.* Dr. Freed issued the same prognosis as before, *i.e.* that plaintiff's level of functioning was expected to remain stable or improve with continued therapy. *Id.*

On February 15, 2018, plaintiff completed another Function Report. *Id.* at 311.  There, she said her daily routine included either running errands or visiting the local community center to study computer programming. *Id.* Plaintiff also reported no problems with personal care and that she spent an hour preparing meals two-to-three times per week. *Id.* at 312–13.  Additionally, plaintiff reported spending a few hours each week doing laundry and cleaning but stated her depression made it hard to find the motivation to complete those tasks. *Id.* at 313. As for her hobbies and interests, plaintiff listed anime and video games.  *Id.* at 314.  She again stated, however, that "depression ha[d] begun to steal [her] interest and enjoyment from everything." *Id.* Plaintiff also reported that she visited the local community center between three and four times per week. *Id.*

On February 22, 2018, plaintiff visited Dr. Freed for an individual therapy session during which she "reported her mood as 'good.'" *Id.* at 677.

On March 5, 2018, Dr. David Deaver, PhD, analyzed plaintiff's case. *Id.* at 429. He found that plaintiff had no limitation in her ability to understand, remember, or apply information and only mild limitations in her ability to interact with others, concentrate, persist, or maintain pace, and adapt or manage herself. *Id.* at 441. Dr. Deaver further noted that his review showed "[n]o depression, anxiety, or agitation present" and that plaintiff's "current symptoms are only mild in nature and do not cause severe impairment." *Id.* at 443.

On March 6, 2018, Dr. Joseph Duckwall, MD, evaluated plaintiff's case and found no "history of physical impairment" even though she had a body-mass index of 32 and suffered from "occasional headaches from estrogen." *Id.* at 445.

By March, 7, 2018, plaintiff's reported mood to Dr. Freed was "depressed, yet stable." *Id.* at 679. Even so, Dr. Freed re-issued her same prognosis for plaintiff on March 12, 2018 and then transferred her care to Aleisha T. Epps, LCSW-C. *Id.* at 681.

Plaintiff attended therapy treatment sessions with Ms. Epps on March 29 and April 26, 2018. *Id.* at 683, 685. Ms. Epps reported no material changes in plaintiff's condition.[6] *Id.*

On May 22, 2018, at a disability hearing, plaintiff challenged the SSA's January 2018 decision to cease her benefits. There, plaintiff testified to the hearing officer that her "[g]ender dysphoria was getting better since she was finally getting treatment. She was doing well, and active in studies, however, Medicare messed everything up and started denying gender transitional services. [In response, plaintiff f]ell back into deep depression when surgery canceled."[7] *Id.* at 147.

When asked to describe her daily activities, plaintiff described waking up, working at a restaurant, studying from eight to sixteen hours every day, running errands, and watching Netflix. *Id.* at 149. She also described no physical limitations but did identify limitations in motivation,

---

[6] The record also shows that plaintiff received treatment at Chase Brexton Health Center on the following days, but that the stated reasons for those visits do not inform plaintiff's challenge to the ALJ's disability determination: April 20, 2016 ("routine follow up" regarding hormone therapy treatment); May 18, 2016 (discussion of hormone therapy treatment); June 22, 2016 (discussion of hormone therapy treatment) July 18, 2016 (discussion of hormone therapy treatment); November 9, 2016 (pre-orchiectomy examination); December 28, 2016 (post-orchiectomy examination); June 21, 2017 (follow-up visit regarding hormone therapy and gender dysphoria); July 19, 2017 (examination of foot fungus); August 30, 2017 (follow-up visit regarding abdominal pain); September 20, 2017 (follow-up visit during which hormone therapy and breast augmentation surgery discussed); December 18, 2017 (discussion of hormone therapy treatment and recent bout with flu-like symptoms); February 1, 2018 (walk-in visit to address flu-like symptoms); February 9, 2018 (examination of foot fungus); March 12, 2018 (pre-breast augmentation examination). AR at 446–561.
[7] This surgery was for breast augmentation. AR at 156.

concentration, memory, and social interactions.  *Id.* at 150.  In her notes, the disability hearing officer described plaintiff as cooperative and commented that plaintiff answered questions appropriately even though she was slow to respond at times. *Id.* at 151.  The hearing officer also identified "responding" and "relating to people" as difficulties she observed in plaintiff. *Id.*  In addition, the hearing officer noted that plaintiff "feels she can work full-time, but would prefer to work part-time in order to focus on her studies and finding a programming job." *Id.* at 156.  The hearing officer, therefore, concluded that plaintiff's "disability no longer continue[d]" and upheld the SSA's prior determination regarding the same. *Id.* at 161.

On June 14, 2018, plaintiff reported feeling "severely depressed" during an individual therapy session with Ms. Epps. *Id.* at 687.  Treatment notes from plaintiff's September 27, 2018 session with Ms. Epps, however, describe plaintiff as "engrossed in doing computer programming work at Novalabs" and note that plaintiff "was very excited and had great priode [*sic*] w\hen [*sic*] displaying the game and computer codes" she had created. *Id.* at 689.

Finally, on October 25, 2018, plaintiff reported to Ms. Epps that she had been "having conflict with individuals at Nova labs," the community center she visits "daily in order to work on her gamin[g] system and computer programming." *Id.* at 691. Ms. Epps nonetheless noted that plaintiff was "adherent to therapy/medical appts" and was "applying for jobs." *Id.* at 692.

## II. Disability Evaluation Process

The Social Security Regulations define "disability" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). To meet this definition, the claimant must have a severe impairment that makes it impossible to do past relevant work or any

other substantial gainful activity ("SGA") that exists in the national economy. *Id.*; *see also Heckler v. Campbell*, 461 U.S. 458, 460 (1983). Determining whether an applicant is eligible for disability benefits under the SSA entails a "five-part inquiry" that "asks: whether (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a medical impairment (or combination of impairments) that are severe; (3) the claimant's medical impairment meets or exceeds the severity of one of the impairments listed in [the SSA's official Listing of Impairments]; (4) the claimant can perform [her] past relevant work; and (5) the claimant can perform other specified types of work." *Hines v. Barnhart*, 453 F.3d 559, 562 (4th Cir. 2006). Before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's Residual Functional Capacity ("RFC"), meaning the most that the claimant can do despite her physical or mental limitations. C.F.R. §§ 416.920(h), 416.945(a)(1).

### A.      The ALJ's Decision

On May 6, 2019, the ALJ issued a decision finding plaintiff not disabled from July 18, 2018 through the date of the decision and denying her application for benefits. AR at 28. Under the first step of his five-part inquiry, the ALJ found that plaintiff was not engaged in any substantial gainful activity. *Id.* at 18.

At step two, the ALJ found that plaintiff had the following severe impairments since July 18, 2018: ADHD, anxiety disorder, affective disorder, learning disorder, and migraines. *Id.*

Under step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the SSA's official Listing of Impairments. *Id.* The ALJ considered listings 12.02 (neurocognitive disorders), 12.04 (depressive, bipolar, and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), 12.08 (personality and impulse-control disorders), and 12.11

14

(neurodevelopmental disorders) but found that plaintiff satisfied none. *Id.*

The ALJ also found that plaintiff's impairments did not satisfy the "paragraph B" criteria—that is, the ALJ found that plaintiff's mental impairments did not result in an extreme limitation in one, or marked limitation in two, of the four areas of mental functioning (the ability to: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself). *Id.* Instead, the ALJ found that plaintiff had only moderate limitations in all four areas of mental functioning. *Id.* at 18–20. The ALJ also found that plaintiff did not satisfy the "paragraph C" criteria. *Id.* at 20.

Before proceeding to steps four and five, the ALJ determined plaintiff's RFC. In doing so, the ALJ considered all reported symptoms and the extent to which those were reasonably consistent with objective medical evidence and opinion evidence. *Id.* at 21–22. The ALJ applied a two-step process, considering first whether plaintiff's underlying impairments would be reasonably expected to produce plaintiff's symptoms, and second whether those impairments limit plaintiff's functioning. *Id.* The ALJ determined that, while plaintiff's impairments could be reasonably expected to cause plaintiff's symptoms, plaintiff's statements about the intensity, persistence, and limiting effects of the symptoms were "not entirely consistent with the objective medical evidence and other evidence" in the record. *Id.* at 23.

The ALJ concluded that plaintiff had the RFC to perform a full range of work at all exertional levels but that she could only: (1) perform simple, routine tasks—"not at a production pace"—performed in two-hour increments following which she would need a break of ten-to-fifteen minutes; (2) occasionally interact with supervisors, co-workers, and the public; (3) occasionally adjust to changes in workplace settings; and (4) work in an environment that was moderately loud or quieter and that had stable lighting no brighter than an average office. *Id.* at

21–22.  In addition, plaintiff would need to be absent one day per month.  *Id.* at 22.

In support, the ALJ provided an overview of plaintiff's mental health treatment, followed by her physical health treatment.  *Id.* at 22–23. The ALJ at this point focused specifically on plaintiff's recent ability to complete "a computer coding boot camp from February to March 2019 that lasted from 9:00 to 5:00pm on a daily basis" as well as plaintiff's stated practice of spending four days per week developing her nascent computer game and the hours she spent studying computer science to further that goal.  *Id.* at 22. The ALJ found these regular activities, coupled with plaintiff's stated ability to perform personal care tasks, "consistent with her ability to perform a range of work, within the parameters of the above residual functional capacity."  *Id.* at 22–23.

As for those parameters, the ALJ explained that plaintiff's performance on past mental examinations confirmed that she was limited to simple, routine tasks "not at a production pace" and with regular breaks.  *Id.* at 23. Specifically, the ALJ noted that on a "Mini Mental Status Examination," plaintiff could not identify the date on the calendar, the county in which the exam was located, or the most recent president but she could immediately recall four of four simple words (and two of four simple words after a brief delay), recite the alphabet, count backwards from twenty, spell the word "world" backwards, and perform the serial seven tasks.  *Id.*  Plaintiff did so, however, at a slow pace and with fidgety behavior. *Id.*

The ALJ further explained that the limitations he identified as to interactions with others and changes in the workplace setting tracked to plaintiff's reported "adjustment limitations" and "level of discomfort with others and perceptions of gender dysphoria bias."  *Id.* at 26.  The limitations with respect to sound level and lighting, meanwhile, corresponded to plaintiff's migraines.  *Id.* at 21, 26.  Finally, the ALJ stated that the monthly absenteeism he included in plaintiff's RFC was meant to account for "mood swings that could lead to absences."  *Id.*

In reaching these conclusions, the ALJ gave no doctor's opinion controlling weight. Regarding plaintiff's mental health, the ALJ found a June 2014 opinion of state agency consultant Dr. Merrion, a July 2014 opinion from state agency consultant Dr. Francis, and a March 2018 opinion of Dr. Weaver "somewhat persuasive." *Id.* at 25–26. He found the January 2018 opinions of state agency consultants Drs. Hutcheson and Montgomery unpersuasive. *Id.* at 25. As for plaintiff's physical health, the ALJ found the March 2018 opinion of Joseph Duckwall "very persuasive." *Id.* at 25.

Under step four, the ALJ found plaintiff had no past work to which she could return. *Id.*

Under the final step, the ALJ found that, considering plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that the plaintiff could perform. *Id.* at 27.

### B. Appeals Council Review

The Appeals Council denied plaintiff's request for review, finding no basis for review, and held the ALJ's decision to be the final decision of the Commissioner of Social Security. *Id.* at 1.

## III. Standard of Review

In reviewing a decision of the Commissioner, district courts are limited to determining whether the Commissioner's decision was supported by substantial evidence in the record, and whether the proper legal standard was applied in evaluating the evidence. *See* 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see also Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). It "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws*, 368 F.2d at 589.

When evaluating whether the Commissioner's decision is supported by substantial evidence, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Secretary." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1996). "Ultimately, it is the duty of the [ALJ] reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence." *Id.* (citing *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)).  If supported by substantial evidence, the Commissioner's findings as to any fact are conclusive and must be affirmed. *See* 42 U.S.C. § 405(g); *see also Richardson*, 402 U.S. at 401.

Although the standard is high, when the ALJ's determination is not supported by substantial evidence on the record or when the ALJ has made an error of law, the district court must reverse the decision. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). In evaluating whether the ALJ made an error of law, the Fourth Circuit applies a harmless error analysis in the context of social security disability determinations. *See Mascio v. Colvin*, 780 F.3d 632, 639 (4th Cir. 2015). The harmless error doctrine prevents a remand when the ALJ's decision is "overwhelmingly supported by the record though the agency's original opinion failed to marshal that support" and a remand would be "a waste of time." *Williams v. Berryhill*, 2018 WL 851259, at *8 (E.D. Va. Jan. 18, 2018) (citing *Bishop v. Comm'r of Soc. Sec.*, 583 Fed. App'x 65, 67 (4th Cir. 2014) (per curium)). An ALJ's error may be deemed harmless when a court can conclude on the basis of the ALJ's entire opinion that the error did not substantively prejudice the claimant. *See Lee v. Colvin*, 2016 WL 7404722, at *8 (E.D. Va. Nov. 29, 2016).

When reviewing a decision for harmless error, a court must look at "[a]n estimation of the likelihood that the result would have been different." *Morton-Thompson v. Colvin*, 2015 WL 5561210, at *7 (E.D. Va. Aug. 19, 2015) (citing *Shineski v. Sanders*, 556 U.S. 396, 411-12 (2009)).

18

**IV.     Analysis**

Plaintiff moves for summary judgment based on two alleged errors she identifies with the ALJ's opinion: (1) that the ALJ's RFC calculation "failed to provide sufficient logical explanation to support meaningful review", and (2) that the ALJ "failed to provide an accurate and logical bridge to support [his] credibility determination" regarding plaintiff's subjective complaints.  Pl. Br. (Dkt. No. 22) at 4–15. Defendant responds in opposition that the ALJ fully explained the basis for his conclusions in a "well-articulated 14-page decision." Def. Br. (Dkt. No. 24) at 12.

The question before the court, therefore, is not whether the ALJ credited the wrong doctor or ignored medical evidence in the record.  Instead, the undersigned must determine the adequacy of the ALJ's opinion.  For the reasons that follow, the undersigned recommends denying plaintiff's Motion for Summary Judgment, granting defendant's Motion for Summary Judgment, and affirming the ALJ's decision.

**A.      The ALJ's Explanation of Plaintiff's RFC**

In determining an RFC, an ALJ is required to consider all "medically determinable impairments of which" they are aware, including "medically determinable impairments that are not 'severe.'" 20 CFR 404.1545(a)(2). The RFC is based on "all of the relevant medical and other evidence" 20 CFR 404.154(a)(3). The Fourth Circuit has held that an ALJ is not required to base an RFC assessment on a specific medical opinion, but instead on the record as a whole, including subjective complaints, objective medical evidence, and medical source opinion. *See Felton-Miller v. Astrue*, 459 Fed. App'x 226, 230-31 (4th Cir. 2011). It is the ALJ's exclusive duty, as a fact finder, to make an RFC assessment. *Astrue*, 459 Fed. App'x at 230-31; *see also* 20 C.F.R. § 404.1546(c).

To assist this Court in conducting its review of an RFC assessment, the ALJ must provide

a "narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activity observations)." *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016). "In other words, a sufficient residual functional capacity analysis must include: '(1) evidence, (2) logical explanation, and (3) conclusion.'" *Jeffrey R.T. v. Saul*, Case No. 3:19-cv-752, 2021 WL 1014048, at *15 (E.D. Va. Feb. 25, 2021) (quoting *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019), *as amended* (Feb. 22, 2019)).

Plaintiff contends that the ALJ failed to provide a "logical" explanation as a general matter and with respect to two specific limitations. Having reviewed the record as a whole, the undersigned rejects plaintiff's arguments. The ALJ's RFC assessment contains the following component parts, each of which logically ties back to—and is explained by—evidence in the record.

*First*, the ALJ determined that plaintiff can perform a full range of work at all exertional levels. AR at 21. He reached that conclusion while explaining that Dr. Duckwall (whose March 2018 opinion he found "very persuasive") had reported that plaintiff was doing well physically aside from occasional estrogen-induced headaches and suffered no serious impairment from her obesity. *Id.* at 26. Moreover, the ALJ cited record evidence that plaintiff regularly presented with clear lungs, a normal gait, and without edema or acute distress. *Id.* at 24, 26. The ALJ also relied on plaintiff's own stated physical ability to prepare her meals, wash her laundry, take public transportation, and clean. *Id.* at 23. As such, the ALJ fully explained his determination regarding plaintiff's physical limitations with logical citations to the record.

*Second*, the ALJ found that plaintiff's work must be limited by her need to perform only simple, routine tasks, not at a production pace, performed in two-hour increments following which

she would need a break of ten-to-fifteen minutes. *Id.* at 21. In support, the ALJ relied on objective medical evidence that showed some "abnormal findings" regarding plaintiff's ability to perform work-related mental tasks but also "many normal findings, such as an ability to perform the serial seven tasks and intact judgment and insight." *Id.* at 25.  Similarly, the ALJ noted that plaintiff described having "periodic problems warranting moderate limitations in learning and focus" but that plaintiff's stated capacity to focus improved following her gender confirmation surgery in 2016, as evidenced by plaintiff's ability to attend an in-person computer coding "boot camp" in 2019 that lasted forty hours per week, Mondays through Fridays.  *Id.* The ALJ also highlighted that when not attending the "boot camp," plaintiff was able to study computer science and work on her own, related projects.  *Id.* at 22.  The ALJ, thus, logically tied the record evidence to the type of work tasks permitted by his RFC assessment.

As for the rate of that work, plaintiff takes specific issue with the ALJ's use of the term "production pace." Pl. Br. at 10–12. Plaintiff is correct that the term "production pace" is neither defined nor self-explanatory.  *Id.* (quoting *Perry v. Berryhill*, 765 F. App'x 869, 872 (4th Cir. 2019); *Thomas v. Berryhill*, 916 F.3d 307, 312–13 (4th Cir. 2019); *Xavier S. v. Saul*, Case No. 1:19-cv-1195, 2020 WL 1015816 (E.D.Va. Mar. 2, 2020)). And when left unexplained by context or the ALJ's own language, its use can be grounds for remand.  *Cf. Perry*, 765 F. App'x at 872 n.1 ("descriptors" needed to explain restriction meant by ALJ's use of the term "non-production jobs").

The question, therefore, is whether the ALJ's decision contains sufficient "context" surrounding the term "production pace" to "explain the restriction intended by the ALJ, and allow [this Court] to evaluate whether that restriction adequately accounted for the claimant's limitations." *Id.* The undersigned finds it does.

The *Xavier S.* case is instructive.  There, the Court reviewed an ALJ opinion that assigned Mr. S. an RFC that limited him to "jobs involving simple, routine, and repetitive tasks with no production rate for pace of work and with no more than occasional interaction with supervisors, coworkers, and the general public. Further, [Mr. S. wa]s limited to jobs with no more than occasional changes in the work setting that require no more than occasional use of judgment or decision making."  2020 WL 105816, at *18.

The Court vacated and remanded the ALJ's opinion after finding the ALJ "erred by failing to define or adequately explain the meaning of the limitation 'no production rate for pace of work' included in [Mr. S.]'s residual functional capacity."  *Id.* at *24.  The Court reasoned that "the limitation restricting plaintiff to jobs 'involving simple, routine, and repetitive tasks' d[id] not sufficiently contextualize or help to explain the production-related limitation" contained in the ALJ's RFC assessment.  *Id.* at *25.  Similarly, "[t]he limitation concerning plaintiff's interactions with others . . . d[id] not have any bearing on the pace or stress level at which plaintiff would be expected to work. The same [wa]s true of the limitation restricting plaintiff to jobs with 'no more than occasional changes in the work setting . . . .'"  *Id.*  In short, the Court in *Xavier S.* analyzed each component of the ALJ's RFC assessment and determined that none of the limitations therein could illuminate what the ALJ meant by "no production rate for pace of work."  *Id.*

Here, the ALJ's RFC assessment is almost identical to what was found insufficient in *Xavier S.*  In both instances, the ALJ restricted the claimant to: (1) "simple" and "routine" tasks; (2) occasional interaction with supervisors, coworkers, and the general public; and (3) occasional adjustments to the work setting.  *Id.* at *18; AR at 21–22.  And the ALJs in both cases restricted the claimants to work not at a "production" rate or pace.  *Id.*  But while the ALJ in *Xavier S.* provided no additional "context" or "descriptors" surrounding that term, the ALJ here did.

Specifically, the ALJ here explained in the clause immediately following the term "production pace" that plaintiff could work only in "two-hour increments following which she would need a break of 10 to 15 minutes." AR at 21.  Such information plainly accounts for the pace at which plaintiff can work and provides sufficient context to understand the ALJ's use of the term "production pace" as it relates to plaintiff's "moderate" limitations in concentration, persistence, and pace.  *Id.* at 19.

Moreover, substantial evidence supports this ALJ's conclusion regarding plaintiff's limitations in concentration, persistence, and pace.  Specifically, Dr. Merrion noted plaintiff had "persistence" but likely would need to "read an instruction many times before understand[ing] it" and that her "pace was slow."  *Id.* at 377.  Similarly, Dr. Francis noted that plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods and in her ability to "complete a normal workday and workweek without interruptions . . . and to perform at a consistent pace without an unreasonable number and length of rest periods."  *Id.* at 381–82.  Dr. Francis continued that plaintiff "may have some difficulty with concentration, however[,] she would be able to concentrate for two hour periods."  *Id.* at 382.

The ALJ found both opinions "somewhat persuasive," *id.* at 25, and the two-hour limitation included in his RFC assessment tracks to Dr. Francis's opinion. More importantly, plaintiff failed to contradict the doctors' opinions through her own testimony that—despite "lots of roadblocks . . . such as the focus issue"—she completed a coding "boot camp" that required forty hours of in-person attendance and engagement.  *Id.* at 60.  Accordingly, the undersigned finds that the ALJ sufficiently explained (and supported) his conclusion regarding the type and pace of work plaintiff could perform.

*Third*, the ALJ concluded plaintiff could only occasionally interact with supervisors, co-

workers, and the public. *Id.* The ALJ explained this limitation by noting that because plaintiff "report[ed] some level of discomfort with others and perceptions of gender dysphoria bias, she is limited to occasional interaction with supervisors, co-workers, and the public." *Id.* at 26. The ALJ supported that finding by citing a February 2018 Function Report in which plaintiff reported "that her impairments affect her ability to . . . get along with others. [And that s]he alleged that she has lost a prior job due to difficulty getting along with others." *Id.* at 22. The ALJ, thus, provided a logical bridge between the evidence in the record and his conclusion that plaintiff only occasionally could interact with others while at work.

*Fourth*, the ALJ decided plaintiff could only occasionally adjust to changes in workplace settings. *Id.* at 22. In support of this limitation, the ALJ noted that plaintiff "has some adjustment limitations, although the undersigned notes that a limitation to occasional adjustment to workplace changes should appropriately accommodate her impairments." *Id.* at 26. Elsewhere, the ALJ noted that plaintiff previously had reported "an 'OK' ability to handle stress and changes in routine." *Id.* at 23. That logical connection between the record and the ALJ's assessment of plaintiff's ability to adjust to changes in the workplace is clear and supported by substantial evidence.

*Fifth*, the ALJ's RFC analysis provided that plaintiff could only work in an environment that was moderately loud or quieter, with stable lighting no brighter than an average office. *Id.* The ALJ explained that he included these environmental limitations "[d]ue to some exacerbations in [plaintiff's] migraines . . . ." *Id.* at 26. The ALJ supported that finding with substantial evidence, *i.e.*, citation to the "very persuasive" opinion of Dr. Duckwall that noted plaintiff suffered from "occasional estrogen-induced headaches." *Id.* Here, too, the logical connection between the record evidence of migraines and the environmental limitations in the ALJ's RFC assessment is obvious.

Plaintiff's strongest challenge is to the ALJ's explanation of his *sixth* and final limitation in his RFC assessment: that plaintiff would need to be absent one day per month. Pl. Br. at 7–9. The ALJ explicitly stated that this limitation was designed to accommodate plaintiff's "mood swings that could lead to absences." AR at 26. Those mood swings were discussed at length during the ALJ's hearing, a summary of which was included in his decision:

> Although [plaintiff] stated that her emotions improved after her gender confirmation surgery, she stated that she still experiences emotional fluctuations. She alleged that her emotions are often heightened for about 7 days per month where she lashes out at others. She also stated that she has 4 to 5 days per month where her emotions "crash." Despite her impairments, she stated that she is creating a computer game about making a creature. In an average week, she stated that she spends 4 days working on it. She further stated that she spends a lot of time studying and recently learned web components. She further stated that she recently completed a computer coding boot camp from February to March 2019 that lasted from 9:00 to 5:00pm on a daily basis.

*Id.* at 22.

With respect to that coding "boot camp," the ALJ specifically asked plaintiff whether she was able to attend the "boot camp" at the required location, on the required days, and for the required time. *Id.* at 75. Plaintiff responded, "I showed up." *Id.*

That ability to "show[] up" is consistent with medical opinion evidence in the record. In 2014, Dr. Merrion opined that plaintiff could "maintain regular attendance in the work place [*sic*], and complete a normal work day [*sic*] or workweek without interruptions from a psychiatric condition if the environment [wa]s sympathetic to her gender identity." *Id.* at 379. Similarly, Dr. Francis opined in 2014 that plaintiff was "not significantly limited" in her "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances." *Id.*

Because the ALJ found that plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [we]re not entirely consistent with the objective medical

and other evidence," and because plaintiff's participation in the month-long coding "boot camp" is the only evidence of her ability to consistently appear for commitments over a prolonged period, the ALJ had substantial evidence to decide that plaintiff only would miss one day of work per month.  Whether the ALJ sufficiently explained how he determined plaintiff would miss no more than one day of work in any given month, however, lies at the heart of plaintiff's petition.

Plaintiff relies on three cases from this circuit in arguing that the ALJ impermissibly failed to "explain how he determined that the [p]laintiff would be absent from work one day per month." Pl. Br. at 9.  The first is *Jeffrey R.T.*, 2021 WL 1014048. There, the ALJ adopted an RFC assessment that allowed the claimant to be "absent one day per month."  The court remanded the case back to the SSA after finding that "[a]lthough the ALJ properly explained that Plaintiff required limitations regarding time off task and absences, the ALJ did not adequately explain her reasoning in determining the *extent* of these limitations."  *Id.* at *16 (emphasis in original).  In reaching that conclusion, the court highlighted the repeated references in the record—by the claimant, his family, his employers, and his doctors—that suggested that the claimant would require far more absences-per-month than allowed for by the ALJ's RFC assessment. *Id.* Specifically, the court noted that the claimant testified he had to "call out of work one to two times *per week*" and his doctors had opined that the claimant's impairments "would probably interfere with him maintaining regular attendance in the workplace."  *Id.* at *17–18 (emphasis in original). The ALJ failed to build a logical bridge (or even explain the connection) between that evidence and her ultimate conclusion regarding the claimant's absenteeism, and the court remanded the case back to the ALJ to permit her the opportunity to do so.

Plaintiff's second cited case, *Fauber v. Colvin*, is similar.  *See* Case No. 6:15-cv-16, 2016 WL 8736904 (W.D. Va. Aug. 12, 2016).  The ALJ there found that the claimant "would be off-

26

task no more than ten percent of the workday; [and] would be absent no more than once per month." *Id.* at *2. The court remanded that decision back to the SSA after finding the ALJ "failed to provide any evidence or reasoning for assigning a ten percent off-task rate specifically." *Id.* at *5. Importantly, the court also noted that it had "no way to know if th[ose] constraint[s] w[ere] based upon [claimant's] moderate limitation in concentration or her panic attacks or perhaps something else." *Id.* at *3.

And plaintiff's third cited case is *Jeffrey B. v. Saul*, Case No. 20-1090, 2021 WL 797920 (D. Md. Mar. 2, 2021). The ALJ in that case provided an RFC assessment that allowed the claimant to miss "ten days in a year." *Id.* at *2. The ALJ, however, "offered no explanation for his conclusion that [the claimant] would miss ten days of work a year." *Id.* at *4. *See also*, *id.* (citing *Deborah P. v. Comm'r Soc. Sec. Admin.*, Case No. 18-1850, 2019 WL 1936721, at *2 (D. Md. Apr. 30, 2019), in which the reviewing court could not ascertain what purpose attendance and time-on-task limitations were meant to serve).

The common thread running through each case is twofold. First, these cases show that the court must be able to ascertain *why* the ALJ included attendance limitations in his RFC assessment and, second, the court also must be able to determine (and trust) *how* the ALJ determined the extent of those attendance limitations. *See, e.g.*, *Deborah P.*, 2019 WL 1936721, at *2 ("Without understanding why the ALJ included those limitations, I am unable to determine if the ALJ supported his findings with substantial evidence"; "I am unable to ascertain how the ALJ assessed Plaintiff's difficulties in staying on task and attending work, and how those difficulties impacted the RFC assessment").

Such scrutiny of an ALJ's calculated absenteeism rate is necessary where, as here, "a one percent increase could preclude competitive employment." *Petry v. Comm'r Soc. Sec. Admin.*,

Case No. 16-464, 2017 WL 680379, at *2 (D. Md. Feb. 21, 2017).  The difference between the instant case and those relied on by plaintiff, however, is that the ALJ here did explain which impairment tracked to the absenteeism rate contained in his RFC assessment and what evidence informed that determination.  Specifically, the ALJ identified plaintiff's "mood swings that could lead to absences" as his reason for allowing plaintiff "one day off work per month."  AR at 26. The ALJ supported that conclusion by conceding plaintiff testified to having between eleven or twelve days per month that are marked by such "mood swings."  *Id.* at 22. But the ALJ found the fact that plaintiff "recently completed a computer coding boot camp from February to March 2019 that lasted from 9:00 to 5:00pm on a daily basis" inconsistent with a finding that plaintiff was prohibited from working during each day that she suffered from heightened or depressed emotions. *Id.*  The medical opinions that the ALJ found to be "somewhat persuasive" supported this conclusion in their independent assessments that plaintiff was not significantly limited in her ability to attend work.  *Id.* at 25.

Conversely, plaintiff has pointed to no evidence in the record showing she would be unable to attend all but one day of work per month other than her own testimony regarding the frequency with which she is afflicted by heightened or depressed emotions. After a thorough review of the entire file,  there is no documented history of missed appointments in the medical record. Thus, the only evidence regarding plaintiff's ability to appear for commitments over a prolonged period is the coding "boot camp" for which she "showed up."  *Id.* at 75.

So while the ALJ did not share the precise math he used to calculate plaintiff's monthly absenteeism rate at one day instead of two, he did provide this Court with enough insight to conduct a meaningful review of what that rate was meant to address and whether it was supported by substantial evidence.  Because the ALJ did so, the undersigned does not find his decision warrants

remand on that point.

**B.    The ALJ's Credibility Determination**

Plaintiff's final challenge to the ALJ's decision is that he improperly assessed plaintiff's subjective complaints. Pl. Br. at 12–15. The ALJ stated that plaintiff has "no problems dressing, bathing, or performing other personal care tasks.  Although she reportedly needs reminders to take medicine, she does not need reminders to take care of personal needs or go places.  She prepares her own meals, washes her laundry, and cleans." AR at 22–23. In light of this capacity to perform regular activities, the ALJ found that plaintiff's subjective statements regarding the debilitating effects of her heightened and depressed emotions were inconsistent with the record. *Id.* at 23 ("The array of activities engaged in by the claimant, and of which she is capable, is inconsistent with the claimant's allegations as to the extent of her work-related limitations.").

Plaintiff faults the ALJ for this conclusion by arguing that the ALJ failed to assess the degree to which plaintiff could perform each listed task on a truly "daily" basis.  Pl. Br. at 12–13. Plaintiff again relies on three cases—each from the United States Court of Appeals for the Fourth Circuit—to make her point: *Brown v. Comm'r Soc. Sec. Admin.*, 873 F.3d 251 (4th Cir. 2017), *Woods v. Berryhill*, 888 F.3d 686 (4th Cir. 2018), and *Arakas v. Comm'r Soc. Sec. Admin.*, 983 F.3d 83 (4th Cir. 2020).

Each case relied on by plaintiff confirms that "[a]n ALJ may not consider the *type* of activities a claimant can perform without also considering the *extent* to which she can perform them." *Woods*, 888 F.3d at 694 (citing *Brown*, 873 F.3d at 263) (emphasis in original).  For instance, an ALJ who notes that a claimant can cook, drive, do laundry, and attend church cannot overlook the fact that the cooking involves only microwaving prepared meals, the driving is limited to short distances, the laundry cannot be done regularly, and the church attendance has stopped.

29

*Brown*, 873 F.3d at 263.  Similarly, an ALJ who notes that a claimant can maintain her personal hygiene must also recognize that the claimant does so despite trouble dressing and drying herself. *Woods*, 888 F.3d at 694.

Plaintiff, here, contends that the ALJ ran afoul of those well-established principles when he noted an array of activities plaintiff could perform but failed to acknowledge plaintiff's stated ability to engage in those activities only when her depression allowed it. *See* Pl. Br. at 12–13. Plaintiff is right—the ALJ did not explicitly concede that plaintiff's 2018 Function Report shows that plaintiff prepares meals only "2-3 times a week," and that "depression makes finding motivation [to do house and yard work] hard." AR at 313.  But the ALJ did not conceal or misrepresent those stated limitations.  He simply did not discuss the frequency with which plaintiff could engage in the activities listed in her 2018 Function Report.  Even assuming the ALJ erred in failing to do so, any such error was harmless.

The ALJ's opinion makes clear that he found plaintiff's stated ability to attend and complete a month-long coding "boot camp" was inconsistent with plaintiff's description of the "intensity, persistence and limiting effects of [her] symptoms."  *Id.* at 23.  And the ALJ used substantial evidence to support that conclusion when, immediately after describing plaintiff's testimony regarding her periods of heightened and depressed emotions, he wrote:

> Despite her impairments, [plaintiff] stated that she is creating a computer game about making a creature.  In an average week, she stated that she spends 4 days working on it.  She further stated that she spends a lot of time studying and recently learned web components.  She further stated that she recently completed a computer coding boot camp from February to March 2019 that lasted from 9:00 to 5:00pm on a daily basis.

*Id.* at 22.

The ALJ, thus, provided an accurate and logical bridge to determine the relationship between plaintiff's stated and actual limitations in daily functioning regardless of his discussion

of plaintiff's 2018 Function Report.  Plaintiff disclaims none of the evidence regarding her ability to attend a coding "boot camp" and that ability plainly played a central (if not dispositive) role in the ALJ's final determination of her credibility. Accordingly, the ALJ used substantial evidence when arriving at his credibility determination of plaintiff.

## V.      Recommendation

For the reasons set forth above, the undersigned Magistrate Judge recommends that plaintiff's Motion for Summary Judgment (Dkt. No. 21) be DENIED, defendant's Motion for Summary Judgment (Dkt. No. 23) be GRANTED, and the ALJ's decision be AFFIRMED.

## VI.     Notice

The parties are notified as follows. Objections to this Report and Recommendation must be filed within fourteen (14) days of service on you of this Report and Recommendation. Failure to timely file objections to this Report and Recommendation waives appellate review of the substance of the Report and Recommendation and waives appellate review of a judgment based on this Report and Recommendation.

                                              /s/
                                _____
                                Michael S. Nachmanoff
                                United States Magistrate Judge

October 22, 2021
Alexandria, Virginia